# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Dieunette Jean Baptiste,

      Petitioner,

v.

Pamela Bondi, et al.,

      Respondents.

No. CV 26-02586 PHX SPL (CDB)

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE STEVEN P. LOGAN:**

Petitioner proceeds pro se in this § 2241 matter which is briefed and ready for the Court's review.

## I.    Background

Petitioner is a native and citizen of Haiti.[1] Petitioner entered the United States on or about June 9, 2023, after inspection at the El Paso, Texas, port of entry, pursuant to an appointment scheduled through the CBP One system. (ECF No. 1 at 8). Upon inspection Petitioner was deemed inadmissible pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), for want of a valid visa or other entry document. (ECF No. 1 at 8, 30). Petitioner was served with a Form I-94 paroling her into the United States, with an "Admit Until Date" of June 7, 2025. (ECF No. 1 at 29). Petitioner was paroled "based on the individualized facts" of her situation, pursuant to § 212(d)(5) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(d)(5). (ECF No. 1 at 7-8, 29). Petitioner was paroled under the "DT"

---

[1] Throughout the petition Petitioner is more commonly referred to by female pronouns, but sometimes referred to by male pronouns. "Dieunette" is most commonly a name given to females.

"Class of Admission" (ECF No. 1 at 29),[2] i.e., she was paroled into the United States for urgent humanitarian reasons or significant public benefit; the DT class includes those paroled into the United States via the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") Temporary Protected Status ("TPS") designation, although it is not clear from the record that Petitioner was allowed entry into the United States specifically via the humanitarian TPS parole for citizens of Haiti.[3] Petitioner was also served with a Notice to Appear,

---

[2] If an immigrant is classified for admission under "DT" status, i.e., humanitarian parole, they are eligible for work authorization, and this form of permission to enter the United States generally includes an expiration date. An alien classified for admission on humanitarian parole may apply for an adjustment of status because they have been "inspected and admitted or *paroled* into the United States." 8 U.S.C. § 1255(a) (emphasis added). Humanitarian parole satisfies this criteria for this threshold requirement, whereas "conditional" parole does not satisfy this requirement. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, *passim* (9th Cir. 2007).

[3] The designation providing temporary protected status ("TPS") for Haitian immigrants was published in the Federal Register as Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010). *See National TPS All. v. Noem*, 166 F.4th 739, 753 (9th Cir. 2026), *rehearing en banc denied*, 169 F. 4th 796 (9th Cir. 2026). TPS designation for Haitians has been extended multiple times since 2010. *Id.* at 752. Haiti was redesignated for TPS in August 2021. *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863 (Aug. 3, 2021). The Secretary of Homeland Security extended and redesignated Haiti TPS in 2023, *see* 88 Fed. Reg. 5022 (Jan. 26, 2023), and this status was extended again in 2024. *See National TPS All.*, 166 F.4th at 752-53.

> For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from July 1, 2024, through August 30, 2024. USCIS will issue new EADs with a February 3, 2026 expiration date to eligible beneficiaries granted TPS under Haiti's designation who timely re-register and apply for EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this Federal Register notice, *DHS automatically extends through August 3, 2025, the validity of certain EADs previously issued under the TPS designation of Haiti*.

Extension and Redesignation of Haiti for Temporary Protected Status, 89 FR 54484-01, at 54485 (July 1, 2024) (emphasis added).

> On February 7, 2025, DHS prepared and circulated a draft decision partially vacating [the] July 2024 extension. The draft decision was reviewed and signed off by DHS staff between February 14 and 17 and signed by Secretary Noem on February 18, 2025. DHS announced the vacatur in a press release on February 20, 2025, and it was published in the Federal Register on February 24, 2025 ("Haiti Partial Vacatur"). *See* Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025).

> The Haiti Partial Vacatur explained that it was shortening Haiti's TPS designation period "from 18 months to 12 months," such that the designation would

placing her in regular removal proceedings and ordering her to appear in immigration court in Miami, Florida, on July 9, 2026. (ECF No. 1 at 30). Petitioner has been living at the same address in Orlando, Florida, since arriving in the United States. (ECF No. 1 at 1, 7, 30). Petitioner avers, and Respondents do not dispute, that she appeared for all of her "ICE check-ins." (ECF No. 1 at 8).

On December 13, 2023, prior to expiration of her parole, Petitioner filed an application for asylum. (*Id.*).

On June 29, 2024, Respondents issued Petitioner authorization to work pursuant to 8 C.F.R. § 274a.12(c)(11) (as a noncitizen "paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act."), which authorization is valid through June 27, 2029. (ECF No. 1 at 8, 27-28).

Petitioner alleges, and Respondents do not dispute, that Petitioner has no criminal record since entering the United States in 2023.

Petitioner asserts that she "was arrested in Florida after ICE encountered Petitioner on the street [on June 30, 2025, after expiration of her parole but prior to the expiration of Haiti TPS status on August 3, 2025]. ICE did not set bond, and Petitioner requested review of [her] custody by an IJ." (ECF No. 1 at 8). Petitioner has been detained at the Eloy Detention Center since November 11, 2025. She asserts release on bond was denied on January 16, 2026, "because she [was] deemed an 'applicant for admission," and the Immigration Judge ("IJ") stated 'No jurisdiction.[']" (ECF No. 1 at 2, 8). On February 12,

---

expire on *August 3, 2025*, instead of February 3, 2026. *Id.* … Secretary Noem subsequently terminated Haiti's TPS, effective *September 2, 2025* ("Haiti Termination"). *See* 90 Fed. Reg. 28760 (July 1, 2025).

*National TPS Alliance*, 166 F.4th at 752-53 (emphasis added).

On January 28, 2026, the Ninth Circuit Court of Appeals affirmed the Northern District of California's conclusion that the plaintiffs in *National TPS Alliance* were entitled to relief on their Administrative Procedures Act ("APA") claims, finding Secretary Noem "exceeded her statutory authority … by partially vacating Haiti's TPS designation." *Id.* at 749, 767. The Ninth Circuit determined "the proper remedy under APA § 706(2) is to set aside [the Secretary's] actions and restore the status quo," *id.* at 767, noting "foreign nationals with TPS who, absent the Secretary's unlawful actions, would be protected from deportation and could receive work authorization, have suffered immense harms that are both concrete and particularized." *Id.* at 768.

2026, an IJ denied Petitioner's application for asylum and withholding of removal, and ordered Petitioner removed to Haiti. (ECF No. 10-1 at 1). Respondents assert Petitioner "subsequently filed an appeal to the Board of Immigration Appeals (BIA) where the case remains pending." (ECF No. 10-1).[4]

**II.      Claims for Relief**

Petitioner contends that because she was inspected at the border and paroled into the United States her detention is pursuant to 8 U.S.C. § 1226(a) and she is eligible for release on bond. Petitioner argues: "While the statute states that the expiration of § 1182(d)(5)(A) parole returns the parolee to the custody from which he was paroled district courts across the country have consistently held that the expiration of § 1182 parole does not require treating the noncitizen as if they had never been paroled in the first place." (ECF No. 1 at 10) (internal quotations omitted). In support of this argument Petitioner cites *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274 (E.D.N.Y. 2025), *Coalition for Human Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 85 (D.D.C. 2025), *Linarez v. Stamper*, No. 26-cv-101, 2026 WL 592294, at *5 (D. Me. Mar. 3, 2026), *Qasemi v. Francis*, No, 25-cv-10029, 2025 WL 3654098, at *12 (S.D.N.Y. Dec. 17, 2025), and *Walizada v. Trump*, No. 25-cv-768, 2025 WL 3551972, at *15 (D. Vt. Dec. 11, 2025). (ECF No. 1 at 10-11). Petitioner argues that, "logically," after her parole expired and she remained in the United States "undetected," her status would be similar "to any other undocumented immigrant who entered the United States without inspection and without DHS having any clue as to there whereabouts," and accordingly she would be entitled to a bond hearing pursuant to 8 U.S.C. § 1226. (ECF No. 1 at 10-11).

Petitioner asserts that her continued detention without an individualized bond hearing is in violation of her Fifth Amendment rights to due process of law. Petitioner also contends the immigration court's finding that she is detained pursuant to 8 U.S.C. § 1225(b) is legal error, citing *Barrera v. Tindall*, No. 25-cv-541, 2025 WL 2690565, at *4 (W.D. Ky. Sep. 19, 2025), *Lopez-Campos v. Raycraft*, No. 25-cv-12486, 2025 WL

---

[4] As of May 21, 2026, the Executive Office of Immigration Review's case information website states "Case information is unavailable" with regard to Petitioner's appeal.

2496379, at *7 (E.D. Mich. Aug. 29, 2025); *Ochoa Ochoa v. Noem*, No. 25-cv-10865, 2025 WL 2938770, at *6 (N.D. Ill. Oct. 16, 2025), and the Seventh Circuit Court of Appeals' decision in *Castañon-Nava v. United States Department of Homeland Security*, 161 F.4th 1048, 1061 (7th Cir. 2025). (ECF No. 1 at 17-18).

Respondents maintain Petitioner's detention is mandatory pursuant to 8 U.S.C. § 1225(b)(2)(A) because she was deemed inadmissible at the border, and they assert her parole has been "revoke[d]." (ECF No. 10 at 3). Respondents do not specify by what means parole was revoked, or clearly state that Petitioner was arrested because her parole was revoked rather than expired. Respondents further argue Petitioner's detention is mandatory because her parole into the United States is not considered "entry" into the United States. (ECF No. 10 at 4).

Respondents assert:

> … courts have held that Section 1182(d)(5) parolees are "treated as though they have not effected an entry into the country at all." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024); *see also Romero v. Garland*, 999 F.3d 656, 661 (9th Cir. 2021) ("Aliens paroled elsewhere in the country for years pending removal are treated for due process purposes as if stopped at the border.") (quoting *Thuraissigiam*, 591 U.S. at 140); *Make the Road N.Y. v. Noem*, __ F.4th __, 2025 U.S. App. LEXIS 31160, at *63 (D.C. Cir. 2025) ("[T]he entry fiction extends to individuals who have been paroled and are awaiting removal proceedings.").

(ECF No. 10 at 4). Respondents also contend: "On June 9, 2023, Petitioner presented themself at a port of entry and was charged as an 'arriving alien'. Doc. 1 at 30. Petitioner thus 'cannot be said to have effected an entry, and must be treated accordingly. *See Thuraissigiam*, 591 U.S. at 139-40." (*Id.*). Respondents maintain "Petitioner has no due process right to release." (ECF No. 10 at 2).

### III.    Due Process in the Context of Noncitizen Detainees

The United States Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Because Petitioner is currently in the United States, she is entitled to the protection of the Due Process Clause of the Fifth Amendment, which provides that she

cannot be deprived of liberty "without due process of law." U.S. CONST. amend. V. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (holding that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Hussain v. Rosen*, 985 F.3d 634, 642 (9th Cir. 2021).

In *A.A.R.P. v. Trump* the United States Supreme Court affirmed that "'[t]he Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings,'" which implicates due process regarding their detention during those proceedings. 605 U.S. 91, 94 (2025), *quoting Trump v. J.G.G.*, 604 U.S. 670, 673 (2025). *See also Reno v. Flores*, 507 U.S. 292, 306 (1993), *citing Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903); *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017). The right to be free from physical restraint is "at the heart of the liberty" guaranteed by the Due Process Clause of the Fifth Amendment. *E.g.*, *Zadvydas*, 533 U.S. at 690. Although "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process," such detention must still comport with the detainee's right to due process of law. *Demore v. Kim*, 538 U.S. 510, 523 (2003). *See also Wong Wing v. United States*, 163 U.S. 228, 235-37 (1896). And the "essence" of procedural due process is that a person who is at risk of losing their liberty must be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1976). Whether an individual within the United States has been denied their Constitutional right to due process is a decision ultimately reserved to the judicial branch of the United States government. *Cf. Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (rejecting the notion that "the political branches have the power to switch the Constitution on or off at will …."). And, when considering a constitutional challenge to detention under INA, the Ninth Circuit Court of Appeals has stated "grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary

deprivation of liberty would have thought so. Arbitrary civil detention is not a feature of our American government." *Rodriguez v. Marin*, 909 F.3d 252, 256-57 (9th Cir. 2018).

### IV.    Analysis of Petitioner's Claims for Relief

The gravamen of Petitioner's claim for relief is that because she was paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5)(A) after inspection at the border, and she has lived in the United States for several years without committing a crime or violating the terms of her parole, and she has an active application for asylum pending with the immigration courts, her detention is pursuant to 8 U.S.C. § 1226(a) rather than 8 U.S.C. § 1225(b) and therefore her detention is not mandatory and the IJ erred by finding they were without jurisdiction to release her on bond or otherwise.[5]

As the Court is aware, parole pursuant to § 1182(d)(5)(A) serves a unique function. Although humparole pursuant to § 1182(d)(5)(A) "does not grant ... 'admission' to the United States," "it effectively halts removal of the alien until the underlying humanitarian or public benefit purpose is achieved." *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011). Section 1182(d)(5)(A) allows the executive to permit certain aliens "'on a case-by-case basis' to enter or remain in this country ...." *Id.* (emphasis added). Accordingly, a

---

[5] Although habeas corpus is "civil in nature[,] and the petitioner bears the burden of proving that his detention is illegal[,]" *Carlson v. Landon*, 186 F.2d 183, 188 (9th Cir. 1950), the mechanics of habeas proceedings are unique. *See Harris v. Nelson*, 394 U.S. 286, 294-95 (1969). When a court confronts a viable habeas petition, it must either award the writ or order respondent(s) to show cause—i.e., to "make a return certifying the true cause of [ ] detention." 28 U.S.C. § 2243; *see also Harris*, 394 U.S. at 298-99 (citation omitted). …"Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris*, 394 U.S. at 300. … Importantly …, a detained habeas petitioner should "not be burdened by the impossible task of imagining and refuting [the] causes" of his detention. *Id.* As the Supreme Court "has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition, that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'" *Harris*, 394 U.S. at 291-92 (citation omitted). *L.M. v. Noem*, No. 25-cv-02194, 2026 WL 103231, at *7 (D. Nev. Jan. 14, 2026).

§ 1182(d)(5)(A) parolee's physical presence within the United States is authorized by the Attorney General, and parole for humanitarian reasons or for public benefit is understood to constitute lawful status. *See*, *e.g.*, *Suarez-Lugo v. Bondi*, ___ F. Supp. ___, 2026 WL 332317 at *5-6 (S.D. Tex. 2026); *Rodriguez-Acurio*, 811 F. Supp. 3d at 294-95. Moreover, although humanitarian parole does not render the parolee "admitted" into the United States, the federal courts have uniformly held that a noncitizen paroled into the United States, who has remained in the United States for at least two years after parole, is not an "arriving" noncitizen subject to mandatory detention under § 1225(b). *See*, *e.g.*, *Cabrera Martinez v. Marich*, 816 F. Supp. 3d 356, 373 (W.D.N.Y. 2025); *Rodriguez-Acurio*, 811 F. Supp. 3d at 303 (concluding that "the grant of humanitarian parole to [petitioner] moved her out of expedited removal proceedings and related mandatory detention [under section 1225(b)]"); *Qasemi*, 2025 WL 3654098, at *9 (finding that "when ICE affirmatively chose to release [petitioner] on parole, it made the decision that he would no longer be subject to the mandatory detention provision of [s]ection 1225(b)(1), as is mandated by subsection (b)(1)(iii)(II)").

The federal courts have generally determined that an individual who has lived freely in the United States under humanitarian parole since their inspection at the border, who is seeking asylum, is "present" in the United States and does have full due process rights. *See*, *e.g.*, *Strunin v. Garcia*, ___ F. Supp. 3d ___, 2026 WL 958952, at *7-8 (S.D. Tex. 2026); *Cardoso v. Hyde*, No. 25-cv-13935, 2026 WL 468200, at *2 (D. Mass. Feb. 19, 2026). The majority of federal district court that have considered circumstances similar to Petitioner's have found that a person paroled into the United States under § 1182(d)(5)(A), who has committed no crime nor violated the conditions of their parole, is detained under § 1226(a) rather than § 1225(b) and may not be detained during the pendency of their removal proceedings without a bond hearing. *See Rincon v. Hyde*, 810 F. Supp. 3d 101, 106-07 (D. Mass. Nov. 7, 2025); *Lopez-Campos*, 797 F. Supp. 3d at 784 ("the Court finds that Lopez-Campos is not subject to the provisions of Section 1225(b)(2)(A). Rather, he clearly falls under the provision of Section 1226(a), and is subject to the discretionary bond

determination outline therein."); *Matkarimov v. Noem*, No. 26-cv-48, 2026 WL 700072, at *2 (E.D. Ky. Mar. 12, 2026); *Wu v. Stamper*, No. 26-cv-0090, 2026 WL 608286, at *4 (D. Me. Mar. 4, 2026) (finding that "a more judicious reading" of § 1182(d)(5)(A) "suggests that a noncitizen whose parole has expired should be treated similarly to the vast majority of undocumented immigrants currently living in this country who are not subjected to expedited removal." (internal quotations omitted)); *Millan v. Voorhies*, No. 25-cv-02779, 2026 WL 248376, at *10 (N.D. Ohio Jan. 30, 2026);[6] *Baabekov v. Raycraft*, No. 26-CV-37, 2026 WL 183515, at *2 (W.D. Mich. Jan. 23, 2026); *Kozubaev v. Lynch*, No. 25-cv-1873, 2026 WL 116797, at *2 (W.D. Mich. Jan. 15, 2026) ("The Court concludes that § 1226(a), not § 1225(b)(2)(A), governs noncitizens, such as Petitioner, who have resided in the United States and were already within the United States when apprehended and arrested....") (collecting cases); *Rodriguez-Acurio*, 2025 WL 3314420, at *17; *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *7-9 (E.D. Mich. Sep. 9, 2025); *Destino v. FCI Berlin*, No. 25-cv-374, 2025 WL 4010424, at *7 (D.N.H. Dec. 24, 2025), *appeal docketed*, No. 26-1181 (1st Cir. Feb. 20, 2026); *Aviles-Mena v. Kaiser*, No. 25-cv-06783, 2025 WL 2578215, at *5 (N.D. Cal. Sep. 5, 2025). *See*

---

[6] The *Millan* court and others have "rejected the notion" that the statement in *Department of Homeland Security v. Thuraissigiam* that

> … "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border," 591 U.S. at 139, extends to treating all aliens as continually "arriving" when applying § 1225(b)(2)(A) against them. *E.V. v. Raycraft*, No. 4:25-CV-2069, 2025 WL 2938594, at *3 (N.D. Ohio Oct. 16, 2025), *citing Coal. for Humane Immigrant Rights v. Noem*, No. 1:25-cv-00872-JMC, 2025 WL 2192986, at *3 (D.D.C. Aug. 1, 2025), *appeal pending* 25-5289 (D.C. Cir. Aug. 11, 2025); *see also Make the Rd. New York v. Noem*, No. 25-CV-190 (JMC), 2025 WL 2494908, *12 n.15 (D.D.C. Aug. 29, 2025). Those cases look to the plain meaning of the term "arrive" to determine the label of "arriving alien" is inapplicable to someone who previously reached a port of entry, underwent inspection, and then was paroled into the country. *E.V.*, 2025 WL 2938594, at *3. As this Court has stated, "'the only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither [provision of Section 1225(b)(1)]. Any other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words.'" *Id.*, *quoting Coalition*, 2025 WL 2192986, at *39.

*Millan v. Voorhies*, No. 25-cv-02779, 2026 WL 248376, at *11 (N.D. Ohio Jan. 30, 2026).

*also Thelusma v. Warden of the Golden State Annex Det. Facility*, No. 26-cv-01443, 2026 WL 1162804, at *3 (E.D. Cal. Apr. 29, 2026) ("Many district courts in the Ninth Circuit have found that non-citizens paroled into the United States ... have a liberty interest in their continued release, entitling them to certain due process protections, the extent of which are determined by applying the test provided in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)," *citing*, *e.g.*, *D.L.C. v. Wofford*, ___ F. Supp. 3d ___, 2026 WL 145646, at *4 (E.D. Cal. 2026) ("[N]umerous courts in the Ninth Circuit have found that when a noncitizen is paroled under that section, his liberty interest does not expire along with his parole.") (collecting cases), *and Anderson v. Chernut*, No. 26-cv-01960, 2026 WL 809990, at *2 (E.D. Cal. Mar. 24, 2026) ("Even though petitioner's parole authorization expired, petitioner maintains her liberty interest in continued release"). *Cf. Kamal Raj v. Mullin*, No. 26-1323, 2026 WL 1300423, at (W.D. Wash. May 12, 2026) ("Courts throughout this circuit have found that where a noncitizen's parole has expired, and the Government makes no effort to re-detain the noncitizen after expiration despite opportunities to do so, the noncitizen's liberty interest continues to grow post-expiration and is incompatible with mandatory detention").

Although Petitioner's parole expired three weeks prior to her arrest, this does not mandate her detention. Although the statutory language of § 1182(d)(5)(a) provides that upon expiration of parole the parolee returns "to the custody from which [s]he was paroled," district courts across the country have consistently held that the expiration of humanitarian parole does not require treating the noncitizen as if they had never been paroled in the first place, i.e., that they were never found to not be a flight risk or a danger to the community and that they were allowed to seek asylum in the United States. *See*, *e.g.*, *Torres v. U.S. Dep't of Homeland Sec.*, No. 26-cv-646, 2026 WL 947955, at *4-6 (M.D. Fla. Apr. 8, 2026); *Montiel v. Raycraft*, No. 25-cv-1610, 2026 WL 32076, at *2 (W.D. Mich. Jan. 6, 2026); *Qasemi*, 2025 WL 3654098, at *10 (rejecting the argument that § 1182(d)(5)(A)'s prescription that a noncitizen be returned to the "custody" from which they were paroled requires a return to the *detention authority* to which they would have

been subject prior to any grant of parole); *Rodriguez v. Rokosky*, No. 25-cv-17419, 2025 WL 3485628, at *1 (D.N.J. Dec. 3, 2025) (same). *See also Walizada*, 2025 WL 3551972, at *15 (calling "absurd" the idea that the expiration of the petitioner's parole placed them in the "perpetual status" of an "arriving alien" as distinguishable from an inadmissible noncitizen); *Chanaguano Caiza v. Scott*, No. 25-cv-00500, 2025 WL 3013081, at *6 (D. Me. Oct. 28, 2025) ("However, it does not necessarily follow that all those paroled under § 1182(d)(5)(A) were detained under § 1225 in the first instance"); *Aviles-Mena*, 2025 WL 2578215, at *4 ("termination of parole does not generally require treating noncitizens as if they had never been paroled in the first place").

Petitioner, having previously been paroled into the United States by the executive, is already present in the United States with pending asylum proceedings. The expiration of her parole does not implicate any requirement to return to a port of entry and undergo a new inspection or screening. *See Perez Yepez v. Stamper*, No. 26-cv-00113, 2026 WL 765350, at *5-6 (D. Me. Mar. 18, 2026); *Linarez*, 2026 WL 592294, at *5; *Qasemi*, 2025 WL 3654098, at *6; *Walizada*, 2025 WL 3551972, at *12. The federal courts have routinely concluded that a noncitizen paroled into the United States has a due process liberty interest — as balanced in a due process analysis — that is not extinguished by parole expiration. *See, e.g.*, *Cabrera Martinez v. Marich*, 816 F. Supp. 3d 356, 372-73 (W.D.N.Y. 2025); *Seyed H. H. v. Andrews*, No. 26-cv-00256, 2026 WL 253426, at *4 (E.D. Cal. Jan. 30, 2026); *Faqeri v. Scott*, No. 26-cv-00003, 2026 WL 194475, at *3 (W.D. Wash. Jan. 26, 2026); *Guzman v. Weiss*, No. 25-cv-02146, 2025 WL 4657897, at *2-3 (D. Or. Dec. 8, 2025); *Omer G.G. v. Kaiser*, No. 25-cv-0147, 2025 WL 3254999, *5 (E.D. Cal. Nov. 22, 2025). Instead, "[§] 1182(d)(5)(a) suggests that rather than reverting to any prior status, a noncitizen whose parole has expired is treated like the vast majority of undocumented immigrants currently living in this country" who are not subjected to mandatory detention under § 1225(b). *Qasemi*, 2025 WL 3654098, at *11 (internal quotations and citations omitted). *See also Rodriguez-Acurio*, 811 F. Supp. 3d at 298-308 (discussing why a noncitizen who has been paroled is not an "arriving" noncitizen, and

distinguishing *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020)), *cited in Bamurange v. Woosley*, No. 26-cv-251, 2026 WL 1269850, at *2 (W.D. Ky. May 8, 2026), *and Bashir K.A. v. Klang*, No. 25-cv-4559, 2026 WL 452353, at *5-6 (D. Minn. Feb. 17, 2026). *See also Coalition for Humane Immigrant Rts.*, 805 F. Supp. 3d at 81-94; *Vasquez-Rosario v. Noem*, No. 25-cv-7427, 2026 WL 196505, at *8 (E.D. Pa. Jan. 26, 2026); *Harmanpreet Singh v. Albarran*, No. 25-cv-01821, 2025 WL 3640678, at *1 (E.D. Cal. Dec. 16, 2025); *Walizada*, 2025 WL 3551972, at *15; *Salgado Bustos v. Raycraft*, No. 25-cv-13202, 2025 WL 3022294, at *6 (E.D. Mich. Oct. 29, 2025); *Rodriguez v. Rokosky*, 2025 WL 3485628, at *4-6; *E.V. v. Raycraft*, No. 25-cv-2069, 2025 WL 2938594, at *4 (N.D. Ohio Oct. 16, 2025); *Aviles-Mena*, 2025 WL 2578215, at *4.

The expiration of parole does not require nor permit detention without a bond hearing. The federal district courts that have considered the question have held that a noncitizen's "parole remains active despite the expiration of [the Form] I-94." *Arias v. Larose*, No. 25-cv-02595, 2025 WL 3295385, at *4 (S.D. Cal. Nov. 25, 2025).[7] *See also Hernandez v. Scott*, No. 26-cv0759, 2026 WL 933361, at *3 (W.D. Wash. Apr. 7, 2026). Various federal district courts have concluded that the expiration of parole does not warrant a noncitizen's arrest and detention absent some form of process. And multiple federal district courts have held that valid revocation of parole requires more than mere expiration.

---

[7] The *Arias* court concluded the revocation of a Colombian petitioner's humanitarian parole was not the product of reasoned decision-making and therefore the respondents did not engage in the required procedure before "purporting" to terminate the petitioner's parole, in violation of the Administrative Procedures Act. The court declined to reach the petitioner's constitutional claim, and ordered the petitioner be released.

> … The Form I-94 given to Arias listed the departure date by which she "must exit the U.S." … But that form is issued to "travelers who are admitted to the U.S., who are adjusting status while in the U.S., or extending their status, among other uses." [] The I-94 is not specific to noncitizens paroled under Section 1182. The listed departure date is unlikely to bind humanitarian paroles who are governed under the parole framework discussed earlier. Moreover, the departure date is recorded at the time the form is issued. An *ex ante* record cannot constitute the real-time "opinion of the Attorney General" that the purpose of parole has been served and the noncitizen must be detained or removed. 8 U.S.C. § 1182(d)(5)(A). In other words, Arias's parole remains active despite the expiration of her I-94.

*Arias v. Larose*, No. 25-cv-02595, 2025 WL 3295385, at *4 (S.D. Cal. Nov. 25, 2025).

In *Benavente v. Raycraft*, the Western District of Michigan determined the government failed to follow applicable statutes and regulations when revoking parole because the record did not indicate that purpose of the petitioner's parole has been accomplished, i.e., the petitioner's application for asylum application was pending when they were detained, the respondents did not produce evidence suggesting the humanitarian reason or public benefit justifying petitioner's parole no longer applied, and there was no indication that the respondents engaged in any individual determination regarding the revocation of parole. *See* ___ F. Supp. 3d ___, 2025 WL 3760755, at *3 (W.D. Mich. 2025). *See also Bakhtani v. Marich*, No. 25-cv-1500, 2026 WL 322625, at *3 (W.D.N.Y. Feb. 6, 2026),[8] *citing Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 419-26 (S.D.N.Y. Sep. 12, 2025) (ordering petitioner's release when parole was revoked "without any individualized assessment"); *Orellana v. Francis*, No. 25-cv-04212, 2025 WL 2402780, at *7 (E.D.N.Y. Aug. 19, 2025) (ordering petitioner's release when the government had not made a case-by-case determination to revoke parole or "provide[d] credible, direct evidence demonstrating" that the petitioner had received any notice, "let alone adequate notice" before parole was revoked).

Respondents assert Petitioner's parole was "revoked" without stating any reason for the revocation. Respondents do not present any record evidence that Petitioner was detained solely due to the expiration of parole or that Petitioner's parole was revoked pursuant to the Secretary of Homeland Security's arguably *ultra vires* termination of Haitian TPS. Notably, the blanket revocation of TPS for Haitian nationals by the Secretary of Homeland Security did not take effect until August of 2025, more than a month after Petitioner was arrested. The expiration of parole granted under 8 U.S.C. § 1182(d)(5) does

---

[8] Because there is no evidence that Bakhtani's parole was properly terminated, and because his abrupt and continuing detention without notice or a meaningful opportunity to be heard violates his right to due process, there is no lawful basis for Bakhtani's continued detention. And because there is no lawful basis for his detention, this Court joins the numerous district courts that have followed its conclusion in *Mata Velasquez[,* 794 F. Supp. 3d 128 (W.D.N.Y. 2025]: that the only proper remedy is immediate release.

*Bakhtani v. Marich*, No. 25-cv-1500, 2026 WL 322625, at *3 (W.D.N.Y. Feb. 6, 2026).

not automatically constitute revocation of parole, as federal district courts have consistently distinguished between automatic termination upon expiration and affirmative revocation, which requires an individualized assessment and compliance with procedural regulations. While parole automatically terminates at expiration without written notice under 8 C.F.R. § 212.5(e)(1)(ii), revocation is a distinct process requiring case-by-case determination and written notice to the noncitizen under 8 C.F.R. § 212.5(e)(2)(i). Recent federal district court decisions have emphasized this distinction. The Western District of Michigan recently held that "just as a grant of parole to noncitizen requires an individualized review, revocation of that parole requires a case-by-case assessment to comply with the Immigration and Nationality Act." *Kenzhebaev v. Noem*, ___F. Supp. 3d___, 2025 WL 3737975, at \*5 (W.D. Mich. 2025). The court explained that 8 C.F.R. § 212.5(e)(2)(i) "not only restates the revocation authority enumerated in § 1182(d)(5)(A), but also clarifies the (admittedly minimal) procedures the Respondents must follow when invoking the parole statute's revocation authority." *Id.* at \*5 n.4, *quoting Gabriel B.M. v. Bondi*, No. 25-cv-4298, 2025 WL 3443584, at \*7 (D. Minn. Dec. 1, 2025).

And the district courts within the jurisdiction of the Ninth Circuit Court of Appeals have determined that even when the express terms of a noncitizen's parole notice allows for discretionary termination or expiration, this "does not somehow obviate the need for the Government to provide an individualized hearing prior to re-detaining the parolee." *Shinwari v. Hermosillo*, No. 26-cv-0009, 2026 WL 262605, at \*4 (W.D. Wash. Jan. 30, 2026), *cited in Castro v. Hermosillo*, No. 26-cv-662, 2026 WL 817388, at \*6 (W.D. Wash. Mar. 25, 2026). *See also Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. Sep. 12, 2025).[9]

---

[9] Petitioner also contends that the IJ's failure to consider releasing her on bond because the court found it was without the jurisdiction to do so, violates her Fifth Amendment right to due process of law. (ECF No. 1 at 23-25). In the past IJs have denied a bond hearing or consideration of bond based on a lack of jurisdiction, pursuant to the holding of the BIA in *Matter of Yajure-Hurtado*, 29 I & N Dec. 216 (BIA 2025). The Board of Immigration Appeals' decision in *Hurtado* is not binding on this or any other federal district court. As the Supreme Court recently emphasized, "courts must exercise independent judgment in determining the meaning of statutory provisions" and "need not ... defer to an agency interpretation of the law …." *Loper Bright Enter. v. Raimondo*,

Petitioner's arrest and detention is contrary to law and in violation of her right to due process. Her release into the United States after inspection at the border reflected a determination by the government that she was neither a flight risk nor a danger to the community, and Petitioner has a strong interest in remaining at liberty unless she no longer meets those criteria. "Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Petitioner's release on humanitarian parole provided her a protected liberty interest. *See, e.g., Fernández López v. Wofford*, No. 25-cv-01226, 2025 WL 2959319, *4-5 (E.D. Cal. 2025) (finding that a petitioner released from immigration detention on parole had a protected liberty interest in remaining out of custody); *Noori v. Larose*, No. 25-cv-1824, 2025 WL 2800149, *4, *9-10 (S.D. Cal. 2025) (same).

When a noncitizen has been "paroled and released into the country, where she has been living at liberty for over two years," the government "may not revoke that liberty without an individualized determination of the need to do so," even when the noncitizen's "parole has expired or been terminated." *Marceau v. Noem*, 26-cv-237, 2026 WL 368953, at *1 (W.D. Tex. Feb. 9, 2026). *Accord Piurbeev v. Rose*, No. 26-cv-910, 2026 WL 499907, at *3 (E.D. Pa. Feb. 23, 2026) (finding an immigrant's due process rights were violated when they were detained two years after their parole had expired). In *Hernandez v. Scott*,

---

603 U.S. 369, 394, 403-04, 412-13 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."). Accordingly, the federal district courts within the jurisdiction of the Ninth Circuit Court of Appeals have generally determined that an IJ's reliance on *Hurtado*, involving immigrants who have lived within the United States prior to being placed in removal proceedings pursuant to 8 U.S.C. § 1226, is not dispositive with regard to whether an immigrant is entitled to bond or a bond hearing. *See, e.g., Escobar Salgado v. Mattos*, 809 F. Supp. 3d 1123, 1133 (D. Nev. 2025); *Rafael R. M. v. Warden, Golden State Annex Det. Facility*, No. 26-cv-00902, 2026 WL 730999, at *5 (E.D. Cal. Mar. 16, 2026), *report and recommendation adopted*, 2026 WL 812750 (E.D. Cal. Mar. 24, 2026). *See also Restrepo v. Jamison*, ___ F. Supp. 3d ___, 2026 WL 141803, at *3 (D. Pa. 2026) ("The Court reminds the parties that it is not bound by the BIA's interpretation of Sections 1225 and 1226. []. In fact, the vast majority of Section 2241 habeas petitions decided in the wake of *Hurtado*, and all of those addressed by this Court up to this point, have rejected the BIA's interpretation of these INA provisions and granted habeas relief.").

2026 WL 933361, at *2, the Western District of Washington court rejected the government's assertion that it could revoke the petitioner's parole and detain them without a hearing because their parole had expired and the government had deemed them an "arriving" immigrant, noting that "[s]everal courts in this Circuit that have reviewed this question determined that neither a now-expired parole nor a noncitizen's status as an arriving alien is sufficient for the Government to revoke parole without complying with the relevant statutory and regulatory provisions," i.e., a hearing pursuant to § 1226," *citing Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1138-39 (D. Or. 2025); *Dieng v. Hermosillo*, No. 26-0190, 2026 WL 411857, at *9 (W.D. Wash. Feb. 13, 2026); *Arias*, 2025 WL 3295385, at *3 (collecting cases).

The Court should interpret the Due Process Clause protections afforded a noncitizen consistent with the longstanding precedent recognizing these protections must be balanced with the government's countervailing interests in immigration enforcement. To determine whether civil detention violates a detainee's right to liberty the federal courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022); *Hernandez v. Sessions*, 872 F.3d at 993; *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). *Mathews* requires consideration of (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

The private interest affected by the official action in this matter is Petitioner's right to be free from de facto imprisonment, "the most elemental of liberty interests." *Hamdi*, 542 U.S. at 529. Petitioner has a right to personal freedom, to be free from detention absent having committed any crime or otherwise violated or abused any agreement with, or privilege afforded by, the United States of America. Petitioner did not violate the

- 16 -

conditions of her parole—she presumably developed community and financial ties to the United States and pursued the purpose of her parole by applying for asylum. Petitioner was granted permission to work in the United States. Her liberty interest in remaining free from detention consistent with the terms of her parole weighs in her favor. *See*, *e.g.*, *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025) ("When he was released from his initial detention on parole, Petitioner took with him a liberty interest which is entitled to the full protections of the due process clause.") (collecting cases). Because parole is granted based on individualized considerations "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), this prerequisite for granting parole prevents an erroneous or arbitrary revocation of parole that fails to consider the purposes for which it was granted and whether they have in fact "been served." *Id.* Respondents offer no explanation regarding how the purpose for which Petitioner was paroled has been served, such that Petitioner should now be detained after she has established ties to the community, qualified to maintain employment, and timely filed an application for asylum. Accordingly, the Court may properly find that the first *Mathews* factor weighs in Petitioner's favor.

The next *Mathews* factor, the risk of erroneous deprivation, is extraordinarily high because Petitioner was detained for no clearly stated reason without pre-deprivation notice and a hearing. The Due Process Clause typically "requires some kind of a hearing *before* the State deprives a person of liberty." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis added). Moreover, when Petitioner was granted a hearing after her arrest, the immigration judge stated they had no jurisdiction to release Petitioner on bond or otherwise, an interpretation of the relevant law that has been rejected by an overwhelming majority of the federal district courts that have considered the issue. And the decision denying asylum and withholding of removal is without any discussion of evidence or any reasoning supporting the decision.

As to the probable value of additional procedure, it is reasonable to conclude that affording Petitioner an additional procedure, such as a bond hearing, would not be of value

- 17 -

because the only procedure provided to Petitioner to date was a decision by an agency official taking the stance that they do not have jurisdiction to order Petitioner's release on bond or otherwise. Additionally, it is noted that at this time both release on bond and relief from removal based on a claim of asylum are routinely denied by the immigration courts on a check-box form without any discussion of the evidence presented or any reasoned explanation. Accordingly, the second Mathews factor also weighs in favor of Petitioner.

The third and final *Mathews* factor considers the government's countervailing interest in detaining Petitioner and the burden of providing additional procedure. Civil immigration detention is permissible only to prevent flight or protect against danger to the community, *see Zadvydas*, 533 U.S. at 690, but the government has provided no allegation or evidence that Petitioner's detention serves either purpose. The record does not indicate that the government would likely be able to proffer evidence justifying Petitioner's detention on the basis that she is dangerous or a flight risk because she was previously found to not be a danger or a flight risk, she has no criminal record, and she asserts (and the government does not dispute) that she has appeared for all of her scheduled immigration court hearings. Respondents have not identified any new information specific to Petitioner's circumstances to undermine its own prior determinations (in 2023, upon her parole into the United States, and in any subsequent periodic appearances in her removal and asylum proceedings, or when the government considered and granting her request for work authorization) that Petitioner will now pose a danger to the community or become a flight risk if allowed to remain at large in the population during her removal proceedings. The government "has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions." *Hernandez*, 872 F.3d at 994.

Nor can the government suggest that the cost of releasing Petitioner or providing her a bond hearing would be fiscally or administratively onerous. If the government has a legitimate interest in detaining Petitioner it need only provide a hearing before a neutral

decisionmaker where the government can present evidence substantiating that legitimate interest. "In immigration court, custody hearings are routine and impose a minimal cost." *Singh v. Andrews*, 803 F. Supp. 3d 1035, 1047-48 (E.D. Cal. 2025). Indeed, the cost to the government of detaining Petitioner would significantly exceed the cost of providing her with a bond hearing or ordering her release. *See Hernandez*, 872 F.3d at 996.

Finally, the balance of the equities and the public interest, which merge in light of the fact that the government is the opposing party, tip sharply in Petitioner's favor. The citizens of the United States have a strong interest in upholding procedural protections against unlawful detention, and the the costs to the public of immigration detention are "staggering." *Id. See also Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021). As the federal district courts have concluded under similar circumstances, "the potential harm to [a petitioner] is significant, while the potential harm to the government is minimal." *Pablo Sequen v. Kaiser*, No. 25-cv-06487, 2025 WL 2203419, at *3 (N.D. Cal. Aug. 1, 2025). The government is not "harmed in any legally cognizable sense by being enjoined from constitutional violations*." Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). "Faced with ... a conflict between minimally costly procedures and preventable human suffering," the Court may reasonably conclude the balance of hardships tips in favor of Petitioner. *Singh*, 803 F. Supp. 3d at 1048.

Accordingly, the Court may reasonably conclude that all three *Mathews* factors weigh in favor of Petitioner and that she has established a violation of her due process rights and Petitioner is entitled to habeas relief.

**V.     Conclusion**

Petitioner's due process rights are violated by her continued detention. The Court may, in its discretion, order that Petitioner be released from custody on recognizance rather than ordering Respondents to provide her with a bond hearing at which the government

would bear the burden of establishing that Petitioner would be a flight risk or danger to the community if released. The federal habeas corpus statute's "mandate is broad with respect to the relief that may be granted," *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968), and provides that "[t]he court shall ... dispose of the matter as law and justice require." 28 U.S.C. § 2243. The Court could reasonably conclude that ordering the government to provide Petitioner with a bond hearing under § 1226 will not "fix" the problem before the Court. Because the government has not asserted a lawful basis for Petitioner's detention, nor provided any documentation establishing the basis for her detention, the Court could find that Petitioner is entitled to immediate release. *See*, *e.g.*, *Bethancourt Soto*, ___F. Supp. 3d___, 2025 WL 2976572, at *9 (D.N.J. 2025). Forcing an individual to wait for a hearing when they are not lawfully detained, particularly when the outcome of that hearing may be preordained, thwarts the purpose of habeas review. *See Kashranov v. Jamison*, No. 2:25-cv-05555, 2025 WL 3188399, at *8 (E.D. Pa. Nov. 14, 2025), *citing Boumediene*, 553 U.S. at 779. Directing Respondents to immediately release Petitioner and permanently enjoining them from detaining her under § 1225 would be a legitimate remedy. *See Bethancourt Soto*, 2025 WL 2976572, at *9.

Accordingly,

**IT IS RECOMMENDED that** the petition for a writ of habeas corpus pursuant to § 2241 at ECF No. 1 be **granted**, and that the Court order Petitioner's immediate release from custody or order that Petitioner be given a bond hearing before a neutral arbiter at which hearing the government shall bear the burden of producing clear and convincing evidence that Petitioner would pose a flight risk or be danger to the community if released from detention on bond or on recognizance. If the Court orders a bond hearing it is recommended that the Court further order that the adjudicator prepare a written, explained decision, rather than checking boxes on a form, describing the clear and convincing evidence proffered by the government that the adjudicator considered when reaching their decision.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. Rule 72(b), Federal Rules of Civil Procedure, provides that the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. Pursuant to Rule 7.2(e)(3) of the Local Rules of Civil Procedure for the United States District Court for the District of Arizona, objections to the Report and Recommendation may not exceed ten (10) pages in length. Failure to timely file objections to any factual or legal determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo appellate consideration of the issues. *See United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 20th day of May, 2026.

Camille D. Bibles
United States Magistrate Judge

- 21 -